Hear ye, hear ye. This Honorable Appellate Court for the Second District is now open. The Honorable Justice Donald C. Hudson presiding, along with Justice George Bridges and Justice Liam C. Brennan. The case is number 219-0137, People of the State of Illinois, Plaintiff Appellee v. David J. Tapley, Defendant Appellant. Arguing for the Appellant, Andrew Gable. Arguing for the Appellee, Stephanie Lee. Thank you, Mr. Kaplan. Mr. Gable, do we have any questions about the procedures we'll be following this morning? No, Your Honor. Ms. Lee, do you have any questions about the procedures we'll be following this morning? No, thank you. All right, then, at this time, Mr. Gable, on behalf of the Appellant, you may proceed. Good morning. May it please the Court, Andrew Gable on behalf of the Defendant Appellant, David Tapley. David Tapley was accused of four counts of aggravated criminal sexual abuse against his niece, R.L. He was convicted of three counts and acquitted of one. The two issues on appeal are, number one, whether it was error for R.L. to testify with her dog on the witness stand, and number two, if it was error for the State to elicit that R.L. was suicidal with the implication that it was because of the Defendant's abuse. As to the first issue, the dog on the witness stand, over-objection, R.L. testified at trial with her dog on the witness stand. The State had initially moved prior to trial for her to testify with the dog as a facility dog, which is a specific Illinois statute requiring that they have to show that the dog is a graduate of a certain organization and for the Court to make considerations including the age of the child and the rights of the parties. In its motion for that, the State argued that this dog was a therapeutic dog that helped R.L. cope with post-traumatic stress disorder, or PTSD, and the defense objected. Prior to trial, however, the State withdrew their motion and, according to the Court, it then contacted the Court's disability coordinator for R.L. to testify with the animal as a service animal under the Americans with Disabilities Act, or the ADA. However, no evidence was ever presented that this was actually a testified that he was only allowed to ask if the animal is required for disability, and number two, does the animal perform work for the individual, and he testified that the work it was trained to do was to assist with coping with the mental illness. Both the disability and the Court believed that they could not ask further questions about the animal, and the Court received some type of written report from the disability coordinator, which was not shared with the defense, apparently, and allowed the dog to testify as a service animal. This is error, because the Court was incorrect in that it could not ask any other questions. Under the ADA, at a minimum, the Court could ask if the animal was, number one, a service animal, and number two, what tasks the animal had been trained to perform. Here, those questions were never asked, and there was no showing that this was actually a service animal, as opposed to an emotional support animal, which is not required under the Americans with Disabilities Act. The state had said that R.L., the complaining witness, suffered from PTSD. However, these records were not shared with the defense. The defense had subpoenaed all the mental health records of the complaining witness, and the Court only allowed them to have the records from the dates of the incident and the indictment, not for anything after those dates. So there was no way to confirm whether or not she had actually been diagnosed with PTSD, and the defense had objected on those grounds. Here, allowing her to testify with the animal was unduly prejudicial. This was not a harmless error. Here, Mr. Tapley was acquitted of one of the counts. There was no corroboration for the allegations. There was no physical evidence and no confession. It's understood that the Court did install a gate at the trial to try to stop the jury from seeing the dog. However, the dog did jump up on R.L.'s lap during her testimony, and the gate alone does not undo the prejudice. The prejudice is the fact that the jury knows that she has an animal with her on the witness stand. The jury heard testimony about the complaining witness going on bike rides, going to family parties, being at choir practice, but nothing with her having to be accompanied by a service animal. The implication here is that something happened to her, and the reason why she has to be accompanied by a service animal is because of the defendant. We are not arguing that people with disabilities should be excluded from courthouses. However, this situation is slightly different because it's a complaining witness on the witness stand. This is not a member of the general public just coming into a courthouse or public library or a Costco. This is someone getting on the witness stand with an animal. Illinois has a specific statute to deal with facility animals, which recognizes the prejudice of this situation, and here the state was able to avoid that by going under the Americans with Disabilities Act. The appellant has cited numerous cases where courts have interpreted the ADA and more specifically have questioned whether or not an animal is a service animal and whether the conditions of the ADA have been satisfied. I know the responses argued that some of these were unpublished. However, none of these were Illinois Rule 23 opinions, and this court is able to look at any other decisions and deem them persuasive, as well as there were many of the decisions that were published in the Federal Register, and the main point of those cases are that courts are allowed to look in to see whether or not this is actually a service animal and what it's been specifically trained to do, and that did not happen. As for the second issue, the state was able to elicit that R.L. was suicidal, again with the implication that she was suicidal because of the defendant. When R.L. testified, she testified that she had disclosed the abuse by an uncle online, and that's why the police came. The state then tried to elicit more that she had posted online that she was suicidal. This was objected to. There was a sidebar, and the trial court ruled that this should not come in. The state, however, continued and was able to elicit from R.L. that she thought she would be dead before the abuse came out. The response argues that this was ambiguous or a reference, that she would live out her life and the abuse would never be disclosed. However, our position is that this was a clear reference to suicide, particularly as the state wanted to get this evidence in front of the jury. Compounding this, the detective, Detective Doherty, who investigated this matter, had testified that he went to R.L.'s house because she was making suicidal claims online. Again, this was objected to, however, was overruled. That testimony was completely irrelevant, and the fact that she was suicidal, especially because she was suicidal because of the defendant's conduct, is unduly prejudicial. This had nothing to do with the investigation of Mr. Tapley. There had already been testimony that the investigation started because R.L. said that she had been abused by an uncle, and that's what started the investigation, and here is just another way for the state to make the situation more emotional. It was the first words out of the state's mouth on closing argument that I thought I would be dead before the abuse came out, and again, this was not harmless error for the same reasons as discussed before. And with that, I will finish my time and invite any questions from the panel. Thank you. Thank you, Mr. Gable. Bridges, do you have any questions of Mr. Gable? I do. Thank you, Justice. Mr. Gable, you agree that a person with a disability such as epilepsy, blindness, or PTSD are allowed to use service animals in an effort to minimize and assist them with their disability limitations while in court. Is that correct? Yes. And so that I'm clear, I want to, that your sole objection regarding the dog is the fact that the trial court failed to inquire of the true nature of R.L.'s disability and whether the dog was trained to address that disability, correct? Yes. However, if even after that, it would be still need to be some kind of balancing of the defendant's rights, just in particular because she is on the witness stand, and this is a situation where the state is alleging that her disability was caused by the defendant. Didn't defense counsel, in fact, have R.L.'s medical records and examine those records and acknowledge that R.L. had been diagnosed with in the common law record 171 to 174? Didn't the defense counsel acknowledge that? And there were, my understanding, there were two pre-trial filings. First, when the state wanted to, I believe, have an expert testify about her PTSD, the defense's response to that did state that R.L. had been diagnosed with PTSD. However, in a later filing, the defense about the service animal had testified that there was no evidence presented that R.L. had been diagnosed with PTSD. So there was conflicting defense filings on that. As for the medical records, the defense only had access to R.L.'s medical records for the date alleged in the indictment. They did not have the medical records for anything after the date of the indictment, and that is when, my understanding, that R.L. was diagnosed with PTSD. You argue in your brief that the presence of the dog improperly invoked sympathy for the victim. My question is, didn't the trial court's limiting instruction regarding the dog's presence remove whatever subconscious sympathy the jury might have held? It would be our position that that instruction is not enough, as well as in the instruction it did tell the jury to ignore the service animal. And by using those words service animal, it does suggest that somebody had made a determination that this was actually a service animal, and that is why he has a special accommodation. Okay. Mr. Capo, in your brief you argue the trial court was required to make a task or functional inquire as to the exact function of R.L.'s service animal, but you don't cite any law in Illinois or otherwise to support this position. You were unable to find any law to support this position. I was unable to find any Illinois state cases dealing with this issue, and in fact I've been unable to find any cases anywhere dealing with the American with Disabilities Act and a dog on the witness stand. It's true there was only one instance where the dog went up on R.L.'s lap and is argued blocked her face. Is that correct? Yeah. And defense counsel immediately asked for the dog to be placed on the floor, and that was done, and there was no testimony solicited during that brief period. Correct? That is correct. This, in other words, what I'm getting at is there's no versus Iowa or people versus Lofton, which was argued. Those are completely different and distinct fact patterns, correct? They are different. This is a far less inclusive structure. However, it's our position that it's just a mere fact that the dog was there, and that is coupled with the dog jumping up does create the issue. Okay. And so back to the PTSD, it's clear from the record before us that R.L. claimed to suffer from PTSD, and isn't that a qualified disability under the ADA? Generally, yes. The PTSD can be recognized. However, they still have to show that the dog was there. I'm sorry. I cut you off. I was just going to say that merely having PTSD does not automatically allow someone to bring an animal into a location. Okay. And my last question is, couldn't R.L.'s testimony that she thought she would be dead before it came out be interpreted that she thought that the sexual abuse wouldn't come out during her lifetime and no one would be made aware of it? That's the response's position, but I think just looking at how the trial was actually happening, the state wanted to get that out to show that she was suicidal. And I think for a 16-year-old complaining witness, I think the more likely reading is that that was a reference to suicide. Thank you, counsel. Thank you, Justice Hudson. I have no further questions. Justice Bridges. Justice Brennan, do you have any questions? I do, although Justice Bridges was very thorough in his inquiry. Let me ask you this, if I may, counsel. The father's testimony at sentencing explained a lot of the things that you complained of were missing in the court's inquiry on whether to allow the service dog to be present during R.L.'s testimony. In terms of conducting an abuse of discretion standard, aren't we allowed to look at the whole record to determine whether the trial judge abused its discretion in allowing the service dog? And if that's the case, couldn't we consider the father's testimony? I believe we could consider the father's testimony. The issue there, however, though, it was number one, not subject to any cross-examination. And number two, it also came up after the fact when this already had become an issue, when the defense had objected to this. I believe this was after the motion for a new trial, which specifically raised this issue. And with the trial court, the other concern is that it had relied on something from the disability coordinator that apparently was not shared with anyone. So it's hard then to compare some testimony afterwards to whatever the trial court was actually relying upon. Why was the father's testimony not subject to cross-examination? Well, there was no cross-examination. I don't know if that... Well, that's a different... I mean, but it wasn't a victim impact statement. It was actual testimony that could have been subjected to cross-examination, correct? It may have been. I don't know. There was no cross-examination. And the other issue with that then would also be if they did not have the mental health records, there was no way to contradict any of this or even to test any of it. Did the trial court review the mental health records in camera before declining to provide them? All right. So we presume the trial court, at least, I recognize that what's in them is not in the record, but the trial court did review them. Yes. There was an in-camera review. And I believe that was all of the mental health records, which would have been up to the date of the trial. Not just limited to the periods of time of the alleged abuse. No, that was what was turned over to the defense. Correct. All right. Thank you very much. I just have a couple of questions. Most of the issues I was going to cover have already been covered by the other justices' questions. And I think Justice Bridges alluded to this, Mr. Gable. I don't know if you specifically answered it. The record appears to show that on May 17th, 2017, defense counsel filed a motion stating that Arielle had been diagnosed with PTSD by her doctors and that he, in fact, had medical records and reports from those doctors on that issue in his possession well before the trial. How did you respond to that in light of your argument that there was no showing that she suffered from a disability? So it was my understanding that that was an earlier filing. And then there was the later filing about the actual service animal where the defense in the later motion disputed that she suffered from PTSD. Well, but obviously, defense counsel, it acknowledged in a pleading that he was aware of that diagnosis at that time, correct? That was in that original filing, yes. All right. And are you now acknowledging that you have been unable to unearth any authority for the proposition that the use of a service dog in a jury trial at the request of the victim is not inherently or is inherently prejudicial and deprives the defendant of a fair trial? Do you have any cases that stand for that proposition? I have not found any cases addressing this specific issue. All right, that's all I have. Thank you, Mr. There's not any further questions from the panel members. Ms. Holt, Ms. Lee, at this time, we will turn to you for your argument. Thank you. Good morning, your honors, counsel. First and foremost, the defendant absolutely received a fair trial. And in fact, the judge went above and beyond making sure that that happened. So they he put the special door installed. He came down into the courtroom beforehand to make sure what would and wouldn't be seen. He had the witness come on the stand ahead of time with the dog, trying to keep it out of sight as much as possible. And as we know from the record, that did in fact occur. There was maybe one instance, and it's not entirely clear from the record, but at most it got up in her lap and it immediately got down. The factors that are not being considered here is the witnesses and victims coming to our courtrooms every day, and they have their own disabilities, issues, concerns, and those they have a right as well to be protected. In this instance, the trial judge made a specific actual finding that he was satisfied that there is in fact, a disability that was covered by the ADA, and that the dog is in fact, a service dog. The question then became, how do we make a reasonable accommodation for that, which the court did by all the effort that he put into making sure that that occurred. The service dog evidence does not, there is nothing in the manuals that are used for interpreting this, or the Illinois case law, or the ADA that says that all of the disability information, even those two questions that the court is permitted to ask, nothing says, number in camera, which is done daily in courtrooms in order to protect privacy. The judge got a written recommendation from the court administrator for the disability administrator, and that was that disability administrator's job was to help assist those decisions, but it was then the court that determined what is going to reasonably accommodate, and also that in fact, it made the requirements. There is absolutely no way we can start opening up victims records full blown into decisions of whether they get to come in with their animal. In fact, the ADA prohibits that when it is in fact, a service dog. You are not intended to ask all kinds of and put it in public records and give it over to the defendant. So the fact that the judge was able to see that in camera and did so is 100% appropriate. The fact is in this particular record, we actually do see a ton of information about her PTSD, but certainly we would not require that in any case, in every case, because the ADA actually gets that fair trial, which in fact he did. The two questions that counsel is talking about, those are questions that may be asked. There is nothing that requires that. The manuals that we use, which we have the one that was put out by the attorney general's office of Illinois. There are some federal ones that can be used, but essentially this is Illinois. They use the guidance from the attorney general, which is read in harmony with the ADA. There is nothing in the manual that is in fact conflicting with the ADA. In addition, as counsel pointed out, there was an instruction, and we do presume that juries follow those instructions. And the instruction said, you are not to draw any in favor of either side. You must focus your attention on the witness, and the service dog shall not be considered in any way in your deliberations or your verdicts. The dog never was admitted as evidence. It was there. It was mainly hidden from the jury. Obviously, we are aware that it came up one time. The jury was also aware that they were supposed to ignore that. To the extent that the defense is speculating that somehow because there was this service dog, the jury would have inferred that it was the defendant who caused that. There is absolutely nothing in the record that would support that. In fact, jurors were told not to speculate. There was no evidence about her PTSD presented to the jury, so they didn't hear about that. We know about it because it's in the record, but the jury certainly didn't hear that. And so there is no evidence whatsoever that the defendant, you know, that that speculation came to pass. And I think, sorry if I may have a minute. I didn't, I agree this is not in my brief, but I would point out in our in our manual, which is cited in the briefs, it does say that the victim witness coordinator is required under the ADA for the public entities of anyone more than 50 employees. And so that's a CFR site that's in the manual on page 14, which says, you know, it's perfectly appropriate that they use these facilitators within the jurisdiction to make those initial assessments, do some weeding out, make a recommendation to the court. But it's then the court that makes the ultimate finding, which was done in this case. And it is the court that, in fact, decides how do we reasonably accommodate this in order to protect both the defendant and the witness. And that is absolutely what was done in this case. Briefly on question two, the two objections to the initial part were sustained. The court, there's no evidence that the jury would have considered it. They're instructed not to. I fully believe that the, I thought I would be dead is ambiguous. She thought she was going to continue to live out her life having to suffer with this, and nobody was going to easily take it that way. And it's certainly not prejudicial in the context of the entire trial. In terms of the officer saying how he ended up at her residence, that was really not offered for the truth of what was asserted. It was offered for the course of the investigation. Why did the officers suddenly show up at her house? And that is perfectly appropriate. Also, because of defendant's questions, defendant wanted to focus on her being on the note flight site. She was on it without adult permission and all kinds of things trying to make her look bad or improper or her parents looking bad. And so they had brought out all the information about that note flight and her behavior on there. That did, in fact, invite how does that lead to police suddenly showing up at her door? And the police showed up at her door because they received some information that she may be suicidal. Again, that only went to the course of the investigation. In any event, at certain points in the brief, they asked for an acquittal, and I don't see any evidence or support or case law that would support acquittal versus a new not entitled to, but there's certainly nothing to support an acquittal. That's mainly what I wanted to say, and I would defer to any court questions. All right. Thank you. Justice Bridges, do you have any questions of Ms. Lee? I do. Thank you, Justice. Ms. Lee, the attorney general's manual required disability coordinators to ascertain the functional limitation of a witness when the nexus, I think it's between the disability and the service animal, isn't apparent. And that's what counsel has argued in this case. Now, this wasn't done here. Shouldn't a trial court then have asked for more evidence of the disability? I would actually respectfully point you to Secured Record 622. The coordinator testified it was readily apparent to him what the nexus was between what the dog did and RL's disability. So, in fact, that was testified to, and yes, we don't know what was in the court's written recommendation from the coordinator, but the court said I reviewed it and I was satisfied that it applied. So, the fact that we don't know what the court saw in camera doesn't mean that the court is being dishonest and somehow didn't review the information. The court said I looked at it and I was satisfied, and we need to trust our judges to do their in-camera review to protect privacy. We do it on a daily basis. And counsel, while a police officer who is testifying is allowed to state the consequential steps taken during an investigation, couldn't Doherty have simply testified he was responding to RL's online posts that raised concerns instead of, you know, testifying that RL had been making suicidal comments online? You could, but the problem with that is that there's the context that the jury does get to see and read the issue. Why would a police officer be concerned? Was she threatening to kill somebody else? I mean, was she? There could have been a gazillion things that would have done that that would have also been prejudicial. So, the point was, it was some suicidal threats that she made that initiated the investigation. And that's an important point when you're considering the entire context of the investigation and of his testimony. Can you tell me the relevance of the statement RL had been online making suicidal comments? What's the relevance of that? It's why the police were concerned in how somebody online saw them and pointed that out and made a report and so they showed up at her door. You would not have showed up at her door had not been making suicidal comments. If you had that's more prejudicial and it's prejudicial to the state and possibly the defendant as well, because it leaves it up in the air to speculate, in fact, what kinds of behaviors was she engaging on in time? Was she online? Was she threatening other people? They came out of a concern for her and it's the suicidal aspect of that that made that happen. Thank you, counsel. I have no further questions. Thank you, Justice. Thank you, Justice Bridges. Justice Brennan, do you have any questions of Ms. Lee? Following up on that issue first, even if I accept the argument that to not inform the jury of why Doherty shows up at the door invites speculation that might hurt either side, accepting that that's accurate, I'm having a serious issue with this idea that anyone is going to credibly argue that when the state opens with, I thought I'd be dead before it came out, that that is not a reference to suicide. I find it just absurd to suggest that that's a reference to, God, I hope that this abuse comes out before I die at the age of 99. I think it's ridiculous. I think the two are juxtaposed together and I guess I'd give you an opportunity to try to tell me first why I'm wrong, but assuming I'm right, why it's not prejudicial. Well, respectfully, my interpretation of that is that it is ambiguous. We're looking at a young... Okay, but let's just say for a second it's subject to a couple of different interpretations. The reason the state opens with that statement is for its power because you don't start your statement with some casual reference that's irrelevant. It's relevant because it reminds the jury of the suicide and then that's relevant because it buttresses the fact that she's suicidal because the uncle's abusing her. That's what the state did and I think to say that, oh, it could have meant something else. Well, maybe, but in the context of everything, it was very intentional in my mind and just assuming it was intentional, explain to me why it was not so prejudicial that the trial was unfair. Fair enough. Obviously, we'll agree to disagree on that point, but the reason it was not prejudicial, first of all, I will point out that there is no argument from the defense that the evidence was insufficient. I realize they're now saying it was a closely balanced... They're not saying it was insufficient. So, what we have is two sustaining... So, the only thing that we would have is... Well, we have the fact that she said she thought she would be dead. I personally believe that it's also an effort to show how impactful this was to this victim, that she was hoping... She was thinking this was... However you want to look at it, but either way, I think that the evidence the jury did, in fact, find for the state. They did acquit. They obviously thought through the evidence. They acquitted on the one incident, which was, I think, the graduation party. As to the other incidents, there was not only her own testimony about what had occurred, but there was corroborating factors through other witnesses. Not to say they saw the abuse itself, but they saw the opportunity, the candy being given out, the special attention they sort of saw to her. All of those things came out. The access to her in the rooms, the access to her bike ride, the access to her at the bus stop, which was odd behavior where the defendant was showing up every morning to be alone with her at the bus stop. And so, there is other evidence. There's substantial evidence, we believe. Certainly, they didn't challenge the sufficiency of the evidence. I don't believe it's as close as defense counsel obviously does, but I would say, if anything, it was, in fact, harmless error. And then I have another question, if we may, about the ADA issue. Is it the state's position that a trial court can never inquire beyond the two questions that the CFR suggests? I think that, number one, we also still have to differentiate between can and must. So, I would say that there's definitely, within the ADA, and the manual that we use in Illinois to interpret that, which is certainly in harmony with the ADA, that our goal is to protect the disabled person to the extent that you start, you know, invasively questioning them and acting as they are not entitled. You are actually, you're violating the victim's rights at a certain point. The other thing is, I think some of these things can be done behind the scenes, in camera, and the defendant doesn't necessarily have a right to see all of that. If I agree with you on that, wouldn't it be a good idea to, for example, in this case, put the coordinator's report or letter to the judge under seal so we can review it? I don't think there would be anything wrong with that. I don't think the defendant has a per se right, but we actually don't do that. If we do, let's say we do it in camera, do you think that when the judge went through the whole history of RL's PTSD and decided that only certain parts of it were relevant, this court would never expect the entire volume of the records that the court went through to be put before the court? Well, actually, I'll have to tell you, being a trial judge for 11 years, I put any number of in-camera reviewed medical records under seal in the file, even though I didn't tender them for the appellate court to review. But that's an aside, we don't have to discuss that. All right, I have no further questions. I appreciate your answers. Thank you. Yes, Mr. Clay, I do have a couple of brief questions to follow up on the points that have been raised. On the issue again of the suicide information that went to the jury, yes, there's a long line of cases well established that a police officer may testify about the steps taken in the investigation and how they got involved. But that doctrine sometimes gets misinterpreted, and the breadth of it gets misinterpreted. There is also a line of cases that say that while that can be done, it should be avoided to bring out the substance of any conversations that occurred out of court. And how do you respond to the question of the argument of about the abuse online? So why couldn't the testimony have been, why did you arrive at her house? We arrived because of information we had received, which would have militated against any prejudicial effect of that statement. So how do you respond to the argument it was unnecessary for him to get into the suicidal aspects of it? Certainly had he testified as you suggested, I don't think that would be error either. But I don't think error was caused in this event either. Witnesses aren't also our puppets. So you asked the witness a question, the witness was answering. I understand we instruct them to stay away from certain aspects, but the officer answered the question to the best of his ability, it appears. I don't think there's any suggestion that the officer deliberately tried to inject that in there, because the question was, why did you go to her house? And it was, we got a report that she was having suicidal thoughts. That's why they went to her house. Let me ask you the question about the argument that ultimately, I think in the record, in the sentencing hearing, it came out in more detail what the disability was that the victim was suffering from, and the fact that the dog in question was a bona fide service dog. That was apparently for the first time those details came out. How do you respond to defense counsel's argument that that was hearsay, it came out in the context of a sentencing hearing, no right to cross-examine or challenge it, as opposed to coming out before the trial? How do you respond to that argument? Well, my initial response is that, again, there's a limited right to explore all the ins and outs of her disability. So the fact that it did come out in this record doesn't mean it should come out in every record. That's the first thing, because the witnesses and the victims do have rights as well to be protected. But at the beginning, I understand they're saying, we asked for the facility dog. We withdrew that motion. So that particular motion really became irrelevant. We don't know exactly why. We assume either that they learned more about the use of the dog, or there is definitely a difference between a service dog and a facility dog. A facility dog is more along the lines of what we would think of as a comfort dog, things like that. This was, in fact, a service dog. When you look at the ADA and you look at the manual and you look at the regulation, you are not supposed to intrude into that person's needed for the situation. In fact, you're actually prohibiting to the extent that you're going to subject the victims or witnesses to that, you are denying them access to the court because you are putting a situation where they're going to withdraw from bringing themselves forward. And that's exactly what you shouldn't do. All right. Thank you, Ms. Lee. Unless there are any further questions of Ms. Lee at this time, Mr. Gable, you may present your final rebuttal summation. Yes. And I will be brief, Your Honors. The state keeps talking about the privacy implications. And our argument is not that this is going to be delving into all the medical records and psychological records. It's really just to see, is this a service animal or not? And what task has been trained to perform? And it's the state that started this case off with wanting to talk about the PPFD and having a facility animal. This is not an attempt to embarrass anyone or to make any private records public. This can be done. It could be done in camera if a record is made, or there can be any numerous protective orders or any other limitations. And secondly, just the PTSD is not necessarily the main issue. There was evidence that sentencing, that she has PTSD. It was brought up throughout the case. It's really about the service animal. And if it is a service, number one, if it's a service animal and what path it's been trained to perform. And that is a very limited questioning. And I think would have satisfied a lot of questions in this matter. And with that, I would invite any other questions from the panel. Justice Bridges, do you have any other questions of Mr. Gable? I do not. Thank you. Brennan, do you have any other questions of Mr. Gable? I do not. Thank you. I do not have any further questions of Mr. Gable. So at that time or at this time, this will conclude the arguments here this morning on this case. I do wish to thank counsel for their presentations this morning and for the quality of their arguments here this morning. The matter will, of course, be taken under advisement and a written disposition will issue in due course. That will conclude the arguments on this matter here this morning. Thank you.